[Cite as *State v. Hayes*, 2018-Ohio-3399.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27776 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-226/3 |
| | : | |
| JARON HAYES | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 24th day of August, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

KRISTIN L. ARNOLD, Atty. Reg. No. 0088794, 120 West Second Street, Suite 1717, Liberty Tower, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Jaron Hayes appeals his conviction and sentence for the following offenses, to wit: Count I: kidnapping (felony or flight), in violation of R.C. 2905.01(A)(2), a felony of the first degree; Count II: kidnapping (remove), in violation of R.C. 2905.01(B)(1), a felony of the first degree; Count III: kidnapping (substantial risk of serious harm), in violation of R.C. 2905.01(B)(2), a felony of the first degree; Count IV: aggravated burglary (physical harm), in violation of R.C. 2911.11(A)(1), a felony of the first degree; Count V: aggravated burglary (deadly weapon), in violation of R.C. 2911.11(A)(2), a felony of the first degree; Count VI: aggravated robbery (serious harm), in violation of R.C. 2929.14 & 2941.145, a felony of the first degree; Count VII: aggravated burglary (deadly weapon), in violation of R.C. 2911.11(A)(2), a felony of the first degree; Count VIII, safecracking, in violation of R.C. 2911.31(A), a felony of the fourth degree; and Count X, having a weapon while under disability (prior offense of violence), in violation of 2923.13(A)(2), a felony of the third degree. Counts I – VIII were each accompanied by a three-year firearm specification. (Count IX and additional counts related to Hayes's codefendant.) Hayes filed a timely notice of appeal with this Court on October 23, 2017.

{¶ 2} The incident which forms the basis for the instant appeal occurred on the night of January 20, 2017, after the victim, C.Z., returned to her residence located in Harrison Township, Montgomery County, Ohio, after shopping for groceries. Upon arriving back at her residence at approximately 8:00 p.m., C.Z. parked her vehicle inside her attached garage. C.Z. then placed her groceries in the basket attached to her walker

and went into the kitchen.[1]  On her way inside, C.Z. deactivated the home's security system but failed to close the garage door.   C.Z. testified that after placing her groceries on the kitchen table, she turned around and discovered that two men were standing inside her house pointing guns at her.

{¶ 3} C.Z. testified that both men were African-American, dressed in black clothes, and wearing gloves and masks that covered most of their faces.   C.Z. described one of the perpetrators as tall and thin while the other man was significantly shorter in height. The shorter man was later identified as Hayes, and the taller man was identified as Randall Williams, Hayes's codefendant.   Both men wore "miner's lights" on their heads which allowed them to see with the lights off.   C.Z. testified that the men emptied out the contents of her purse and found her ATM card.   At that point, the men forced C.Z. into the backseat of her car, and they drove to a nearby Fifth Third Bank.   C.Z. testified that Hayes drove the vehicle while Williams sat in the backseat holding a gun against her side. Once there, the men ordered C.Z. to withdraw money from the drive-up ATM.   C.Z. withdrew $300.00 which she then turned over to the men.   They drove through the drive-up ATM a second time because the men wanted to find out the amount of C.Z.'s account balance.   After discovering her account balance, the men accused C.Z. of "holding out" on them and threatened to shoot her.

{¶ 4} After visiting the bank, they drove back to C.Z.'s residence where the men proceeded to ransack the house for valuables.   C.Z. testified that while her house was being searched, one of the men was always watching her and pointing a gun at her.

---

[1] C.Z. testified at trial that she has multiple sclerosis (MS) and therefore requires the aid of a walker in order to move around.

Shortly thereafter, the men informed C.Z. that they were taking another car ride to "get rid" of something. In this instance, Williams drove the vehicle while Hayes sat in the backseat with C.Z. C.Z. testified that during the car ride, Hayes held his hand over her face in order to obscure her vision. Hayes also kept a gun pressed to C.Z.'s side. C.Z. testified that although her vision was limited, she was able to determine that their location was nearby her residence. When Williams stopped the vehicle, Hayes got out of the car with a backpack. When Hayes returned to the vehicle, he was no longer carrying the backpack, and they drove back to C.Z.'s residence.

{¶ 5} Once back at C.Z.'s residence, the men began searching for valuables again. Eventually, the men discovered a safe located in the closet of C.Z.'s study. C.Z. testified that one of the men told her that they would start cutting off her fingers if she did not provide them with the combination to the safe, but C.Z. testified that she did not know the combination. Thereafter, the men retrieved tools from the basement which belonged to C.Z.'s late husband and began trying to force the safe open.

{¶ 6} C.Z. testified that she had to use the bathroom several times throughout the ordeal, and each time, Hayes would escort her to the bathroom and watch her the entire time. C.Z. testified that as she entered the bathroom she would turn the lights on out of habit. Although Hayes would quickly turn the lights off, C.Z. testified that she was able to see part of his face through the mask. At trial, C.Z. was able to identify Hayes as the shorter suspect. C.Z. also testified that Hayes slapped her in the face and pulled her hair if she talked too much as the crimes occurred. C.Z. testified that the men poured bleach all over the house as well.

{¶ 7} After several failed attempts to force the safe open, Hayes and Williams

found a circular saw which they tried to use to cut the door off of the safe. C.Z. testified that as soon as the saw blade touched the safe, it made a loud, screeching noise which, in turn, activated the house alarm system. Hearing the alarm, Hayes and Williams fled from C.Z.'s residence at approximately 5:00 a.m., having held C.Z. captive for almost nine hours. Once she was alone, C.Z. immediately called 911.

{¶ 8} Shortly thereafter, Deputy Joseph Schwieterman was dispatched to C.Z.'s residence. After C.Z. calmed down, she informed Deputy Schwieterman that the suspects had discarded a backpack nearby and provided him with an approximate location. Based upon that information, officers were dispatched to the area described by C.Z. After a brief search, the officers located a backpack in a line of trees just off of the street. The officers found C.Z.'s driver's license, ATM card, and insurance card inside the backpack. The officers also found a black hooded sweatshirt and a pair of black sweatpants with bleach stains on them.

{¶ 9} In light of their discovery, the officers decided to put the area under surveillance in case the suspects returned to retrieve the backpack and its contents. At approximately 7:30 a.m. on January 21, 2017, the officers observed a silver Pontiac sedan pull up to the area where the backpack had been found. Hayes exited the front passenger door of the vehicle and began searching for the backpack. At this point, the officers announced their presence and attempted to take the suspects into custody. Hayes fled on foot and was able to escape for the time being.

{¶ 10} The driver of the vehicle was identified as Daviana North, Hayes's girlfriend. The other passenger in the rear of the vehicle was identified as Williams, Hayes's accomplice. North and Williams surrendered to the officers without incident. The

officers searched Williams and found jewelry belonging to C.Z. in his possession. The officers also found a pair of C.Z.'s earrings inside the vehicle, as well as a 9mm handgun hidden under the seats.

{¶ 11} Melissa Porcher testified that, at approximately 9:30 a.m. on January 21, 2017, she observed Hayes enter the Wendy's restaurant on North Main Street in Dayton where she was employed. Porcher testified that Hayes informed her that he had just been robbed and asked if he could use the store telephone. Porcher further testified that Hayes declined her offer to call the police for him, stating that he had outstanding warrants for his arrest. Porcher testified that Hayes was not wearing shoes or socks when she spoke with him.

{¶ 12} Thereafter, deputies from the Montgomery County Sheriff's Office obtained a warrant to search Hayes's residence where he lived with his mother and other members of his family. Inside the house, the deputies discovered a pair of bleach-stained sweatpants and a .380 caliber semi-automatic handgun located inside a chest freezer in Hayes's basement.

{¶ 13} Hayes was arrested and taken into custody on January 23, 2017, after the police were able to track him to his sister's house using information from his cellphone provider. Detective Ashkay Gyan testified that he interviewed Hayes regarding his involvement in the robbery of C.Z. The record establishes that Hayes was informed of his *Miranda* rights prior to being questioned. Hayes voluntarily agreed to speak with Detective Gyan. After initially denying his involvement in the robbery, Hayes eventually admitted to Detective Gyan his involvement with Williams in the crimes against C.Z.

{¶ 14} On January 30, 2017, Hayes was indicted for the following offenses, to wit:

Count I: kidnapping (felony or flight); Count II: kidnapping (remove); Count III: kidnapping (substantial risk of serious harm); Count IV: aggravated burglary (physical harm); Count V: aggravated burglary (deadly weapon); Count VI: aggravated robbery (serious harm); Count VII: aggravated burglary (deadly weapon); Count VIII, safecracking; and Count X, having a weapon while under disability (prior offense of violence). As previously stated, Counts I – VIII were each accompanied by a three-year firearm specification. At his arraignment on February 2, 2017, Hayes stood mute, and the trial court entered a plea of not guilty on his behalf.

{¶ 15} Prior to trial, Hayes waived his right to jury trial with respect to the offense of having a weapon while under disability. Thereafter, the case proceeded to trial on September 26, 2017, and ended on October 2, 2017. We note that at trial, Hayes testified in his own defense. Specifically, Hayes testified that he lied regarding his involvement in the robbery so that North, his girlfriend, would be released from jail. Hayes further testified that he only knew details about the robbery and C.Z.'s residence because Williams had previously informed him of those details.

{¶ 16} Hayes was found guilty by the jury on Counts I – VIII, and the trial court later found Hayes guilty of Count X, having a weapon while under disability. The trial court sentenced Hayes to an aggregate sentence of 13 years in prison and ordered him to pay restitution to C.Z. in the amount of $3,105.00.

{¶ 17} It is from this judgment that Hayes now appeals.

{¶ 18} Hayes's sole assignment of error is as follows:

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL'S PERFORMANCE FELL BELOW THE

OBJECTIVE STANDARD OF REASONABLENESSS WHEN HE LED THE VICTIM TO IDENTIFY APPELLANT WHICH ULTIMATELY PREJUDICED THE OUTCOME OF THE CASE.

{¶ 19} In his sole assignment, Hayes contends that he received ineffective assistance when his trial counsel, during the cross-examination of C.Z., essentially laid the foundation for the victim to positively identify Hayes as one of the men who broke into her home and robbed her January 20, 2017.

{¶ 20} In order to prevail on a claim of ineffective assistance of counsel, Hayes must satisfy a two-prong test. First, Hayes must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This first prong requires Hayes to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Hayes can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, Hayes must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694.

{¶ 21} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of

counsel." *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 37 (2d Dist.), citing *Strickland*; *State v. Parker*, 2d Dist. Montgomery No. 19486, 2003-Ohio-4326, ¶ 13.

{¶ 22} "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *Id.*, citing *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

{¶ 23} During the cross-examination of C.Z., the following exchange occurred between C.Z. and defense counsel:

Defense Counsel: Now, these masks, were they on them the entire time?

C.Z.: Yeah, they were. They – as a matter of fact, they got hot and they opened up all my back doors and turned on the air conditioning.

Q: So that was a yes. I think at one point you said there was a bathroom light that was turned on and that –

A: Yes.

Q: Was the individual – were you able to see a partial face at that time?

A: Yes, I did.

Q: Okay. Was the mask on?

A: Yes, it was.

Q: Okay. So the mask was still on. And how much of the face was –

A: You can see the shape of the nose and the eyes and, you know, the

complexion, a little bit of the complexion.

Q: *Okay. Anything* [sic] *that you can make a positive identification of?*

A: *I think I could.*

Q: *You think that you could?*

A: *You know, nine hours under those circumstances, like I said, your senses are so heightened. You know what I mean by that?*

(Emphasis added.) Tr. 356-357.

**{¶ 24}** During C.Z.'s testimony on redirect, the State pursued the following line of inquiry:

The State: [Defense counsel] had made certain questions in relation to whether you think you could make an ID in relation to the case, and you said that you think you could.

Defense Counsel: You Honor, could we have a sidebar?

The Court: Yes.

(At sidebar, indiscernible)

(End sidebar)

The State: [C.Z.], [defense counsel] had asked whether you would be able to identify the defendant in his cross-examination, and you indicated yes. I want to go through a few things.

C.Z.: Okay.

Q: The shorter individual in this instance, you indicated he was the one watching you in the bathroom.

A: That is correct.

Q: And when you were in the bathroom, there were times when the lights came on?

A: Well, because if we – if you enter a dark room, you automatically flip the switch. You know, I mean, that's what most people do, you know. And I didn't do it intentionally, you know, it was habit. And then I was afraid he was – and I turned around and looked at him, and that's how I know – you know, saw him.

Q: And you were able to see his face during that –

A: That is –

Q: -- period –

A: -- correct.

Q: -- of time? *Is the defendant seated in the courtroom today?*

A: *Yes, he is.*

Q: *Can you point out where he's sitting and what he's wearing?*

A: *Do you really want me to do that? Should I really do that?*

Q: *If he's sitting in the courtroom today –*

A: *Yes. Okay.*

Q: *-- where is he sitting and what is he wearing?*

A: *He's right – sitting right there.*

Q: *And what is he wearing?*

A: *A white shirt with a cranberry tie.*

The State: *Identifying the defendant for the record, Your Honor.*

The Court: *The record will so reflect.*

(Emphasis added.) Tr. 374-375.

{¶ 25} Based upon the preceding excerpts from the record, Hayes argues that his trial counsel was ineffective when he initiated a line of questioning during the cross-examination of C.Z. which ultimately permitted the State to elicit a positive identification of Hayes by C.Z. during her testimony on redirect.[2]  Specifically, Hayes contends that "had defense counsel not 'opened the door' to this line of questioning, [C.Z.] would have never made a positive identification of the Appellant on the stand for the jury to observe." Thus, Hayes argues that but for defense counsel's error in this regard, the outcome of the trial would have been different.   We disagree.

{¶ 26} We note that on the morning after C.Z. testified and identified Hayes as one of the perpetrators, the parties held an in-chambers conference with the trial court, during which the following discussion occurred:

The Court: We're on.   Okay.   Please, be seated.   We're on the record, out of the presence of the jury.   It's September the 28th at about 9:55 a.m. Present are the assistance prosecuting attorneys, defense counsel, Defendant, and officers.   First subject is some of the examination of [C.Z.] yesterday, direct and cross, with respect to, I think, the issue of recognition or identification.

[Defense counsel], anything you want to indicate?

Defense Counsel: To sum this up, there were parts of the – of her testimony that were not in the police reports.   One of such parts was that she stated

---

[2] We note that the State did not ask C.Z. to identify Hayes during her direct testimony regarding the events in the bathroom.

that there was a light turned on, and she was able to see a part of the individual's face, although, it wasn't necessarily clear. My client was taking notes next to me and specifically wrote that when she said she saw the face, can she say if it was my face that she saw? I then wrote back, if she [sic] wanted to ask me if she recognizes the face in the courtroom.

We had discussions after that. We ended up breaking, but also, while the testimony was occurring, about potential dangers of number 1, opening that door because you could not close it after the fact, once it's been opened; number 2, that it could be potentially dangerous if we're asking questions that you don't know the answer to. And that's it.

The Court: And as a result of those discussions, you decided to –

Defense Counsel: They tiptoed – I tiptoed –

The Court: -- inquire into that area?

Defense Counsel: Yes, I inquired into that area about how much of the mask could be seen and whether there could not be, I think I included in the negative that there was not a – or that there was not a – any sort of –

The Defendant: -- description.

Defense Counsel: Yeah, description, what have you that could be made from that, and she started, well, she thinks that she could.

The Court: Okay.

Defense Counsel: So then, that – I ended that and it was brought up on redirect. I just wanted to acknowledge that.

The Court: You did that – you indicate that Mr. Hayes either approved of

you getting into that area or he –

Defense Counsel: That was discussed fully.

The Court: -- wanted you to get into that area.

Defense Counsel: Yes.   Yeah.

The Court: Okay.   And, Mr. Hayes, you agree.

The Defendant: Yeah.

The Court: Okay.   That covers that.

Defense Counsel: Well, I guess there's one other thing.   I guess the potential danger, too, would be if that question was brought up and I would have chose [sic] to not ask it, and then it would have been a situation where it's sort of a catch 22.   If I don't ask that question, and she stated that she saw the face and nobody ever asked that, that if there was a verdict of guilty, there could, potentially be, the Appellant or Defendant would state that counsel didn't ask the question and there could have potentially been her being able to – to not be able to recognize the individual in the courtroom. So once that [is] brought up – also, it's kind of a catch 22 in the aspect.

The Court: Okay. So noted.   ***.

**{¶ 27}** Upon review, we conclude that the record establishes that defense counsel was following the wishes of his client, Hayes, when he questioned C.Z. regarding her ability to identify the suspect whom she observed in her bathroom when the lights were on.   Although it was a particularly risky line of questioning, Hayes and his counsel ostensibly hoped that C.Z. would testify that she was unable to make any identification of Hayes due to the mask.   Moreover, defense counsel did not make the decision to pursue

that line of questioning until after extensive discussions with Hayes regarding the risks and benefits of that tactical decision. Since this tactical decision was made after consultation with defense counsel and with knowledge of the peril involved, Hayes cannot now claim on appeal that he received ineffective assistance when his counsel was merely acting at his behest.

{¶ 28} Additionally, even if we were to find that defense counsel was ineffective for questioning C.Z. regarding her ability to see the perpetrator and make an identification, Hayes cannot establish there was a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. At trial, the State adduced evidence that Hayes confessed to police regarding his direct involvement in the crimes committed against C.Z. The evidence also established that Hayes, accompanied by North and Williams, returned to the location where C.Z. remembered that the two suspects had discarded a backpack. Moreover, the police actually witnessed Hayes walk to the specific location where they had recently recovered a backpack which contained C.Z.'s driver's license, ATM card, and insurance card. Hayes fled when the police announced themselves. Further, police found dark colored, bleach-stained sweatpants in Hayes's home, as well as a small caliber handgun in a freezer in the basement. Accordingly, even if we were to find that defense counsel was ineffective for questioning C.Z. with respect to an identification of the perpetrator, Hayes cannot show any reasonable probability that the outcome of the trial would have been different.

{¶ 29} Hayes's sole assignment of error is overruled.

{¶ 30} Hayes's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Michael J. Scarpelli
Kristin L. Arnold
Hon. Timothy N. O'Connell