[Cite as *State v. Walker*, 2019-Ohio-3121.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28111 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-3361/2 |
| | : | |
| JARMARKO E. WALKER, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of August, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CHARLES W. SLICER, III, Atty. Reg. No. 0059927, 426 Patterson Road, Kettering, Ohio 45419
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Jamarko E. Walker, Jr. appeals from a July 31, 2017 judgment entry of conviction in the Montgomery County Court of Common Pleas. He was found guilty by a jury on multiple charges, including murder; the trial court also found Walker guilty of having weapons while under disability. Walker was sentenced to an aggregate term of 24 years to life. We affirm the judgment of the trial court.

{¶ 2} Walker was indicted on December 20, 2016, as follows: Count 1 - murder (proximate result of aggravated burglary), in violation of R.C. 2903.02(B); Count 2 - murder (proximate result of aggravated robbery), in violation of R.C. 2903.02(B); Count 3 - murder (proximate result of felonious assault), in violation of R.C. 2903.02(B); Count 4 - murder (proximate result of improper discharge of a firearm at or into a habitation), in violation of R.C. 2903.02(B). These four counts were unclassified felonies, and each included a firearm specification.

{¶ 3} Additionally, Walker was indicted on: Count 5 - aggravated burglary (deadly weapon), in violation of R.C. 2911.11(A)(2), a felony of the first degree; Counts 6-10 - aggravated robbery (deadly weapon), in violation of R.C. 2911.01(A)(1), felonies of the first degree; Counts 11-14 - felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), felonies of the second degree; Counts 15-18 - felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), felonies of the second degree; Count 19 - improper discharge of a firearm at or into a habitation, in violation of R.C. 2923.161(A)(1), a felony of the second degree; Count 20 - discharge of a firearm on or near prohibited premises, in violation of R.C. 2923.162(A)(3)/(C)(4), a felony of the first degree. All of these offenses included firearm specifications. Walker was also charged

with Count 21 - having weapons while under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), a felony of the third degree.

{¶ 4} Walker pled not guilty on December 22, 2016. On January 5, 2017, he filed a motion to suppress identification evidence. On February 17, 2017, the court held a hearing on Walker's motion to suppress in conjunction with the motion to suppress filed by Walker's co-defendant, Curtis McShann.

{¶ 5} The evidence presented at the suppression hearing was as follows:

{¶ 6} Michael Debord testified that he was a detective with the Dayton Police Department homicide unit, and he assisted in the presentation of a photo lineup for a witness in this case. Debord stated that he was not involved in the investigation and "knew nothing about this case" at the time. He testified that he was never shown photos of any potential suspects. Debord stated that he and Detective Nathan Via proceeded to the home of a witness with the photospread provided to them. Debord testified that a female answered the door; Debord showed the photospread to a male witness, James Mitchell, in the dining room while Via and the female were in another room. Debord identified the original photospread of six photos that he showed to Mitchell (Exhibit 3). He stated that he read verbatim the instruction sheet that was provided to him and initialed the sheet thereafter. Debord stated that he wrote the date, October 27, 2016, the time, 10:55 a.m., and the address of the home on the sheet, and he signed the photospread "and then marked blind because I was a blind administrator. I had no idea who the individual was I was showing."

{¶ 7} Debord testified that Mitchell "fairly quickly selected a photograph" and said, "That's Jamarko." Debord further testified that Mitchell wrote on the document that he

recognized the person in "photo number 3" as the person who had robbed him and held him down with AK-47 or machine gun. Mitchell signed the packet and circled photo number 3; Debord and Mitchell also signed the bottom of the "six pack page." Debord he did not have the "key" to the photospread, which identified the subjects in the photos, in his possession at the time. Debord testified that he did nothing to influence Mitchell's selection.

{¶ 8} On cross-examination, Debord testified that he had been unaware that Mitchell had previously been shown photospreads when Debord presented the photospread; Debord also did not know at that time if any arrests had been made in the case. Debord testified that he and Via never discussed the case.

{¶ 9} Officer Kevin Phillips, a police officer assigned to the homicide/assault unit of the Dayton Police Department, testified that Detective Brad Daugherty asked him to prepare a photospread for Walker. He identified Exhibit 3 as the photospread he prepared. To prepare the photospread, Phillips "accessed the computer program Justice Web," entered Jamarko Walker's name to get a picture of him, and used "a drop-down tab on the program itself, which gives you an option to create a photo line-up. I did activate that." Phillips testified that "numerous photographs come up within the same parameters" that fit the description of Walker in the height, weight, description, eye color, et cetera, and the computer "allows you to look at the photographs and to select those additional photographs who are like and similar to your suspect."

{¶ 10} Phillips testified that, in the process of creating the photospread, rows of photos appeared on the screen, and he selected photos with similar backgrounds, hairstyles, skin tone, and distance from the camera to Walker's photo. After selecting five

photos, Phillips testified that the program "automatically generated" a photospread with the six photographs in a random order. Phillips printed the photospread, put it in a manila folder, and gave it to Det. Daugherty. He testified that he removed the "key" identifying the photos, which "is maintained separately from the photospread" in the case file. On cross-examination, Phillips stated that he had more than 50 photos from which to choose.

{¶ 11} Detective Brad Daugherty of the Montgomery County Sheriff's Office testified that he was assigned to the Dayton-Montgomery County homicide task force and, specifically, that he was assigned to investigate the homicide of Brandon Lanier, which occurred on October 25, 2016. Daugherty testified that Curtis McShann was identified as a suspect, and that another potential suspect had a first name of "Damarko or Jamarko." Daugherty knew McShann had a brother named Jamarko; he requested that Detective Chad Jones prepare a photospread including Curtis McShann another photospread including Jamarko McShann.

{¶ 12} Daugherty testified that the McShann photospreads were shown to Mitchell by Detective Rod Roberts on October 26, 2016.[1] Daugherty testified that Mitchell identified Curtis McShann in his photospread; however, "although pages 1 and 2 were complete" and the third page showed "what photo he identified," Det. Roberts forgot to have Mitchell "circle the photo on the 4th page." As a result, Daugherty located Mitchell on October 27, 2016, as Mitchell arrived home, and they talked outside; Daugherty showed Mitchell the photospread again, and said, "the detective indicated that you had

---

[1] At the suppression hearing, Det. Jones testified regarding his preparation of the McShann photospreads. The prosecutor indicated that Rod Roberts was unavailable, and Roberts's testimony was scheduled for a later date. Roberts's testimony from the suppression hearing is not part of our record.

identified a photo, * * * but he didn't have you circle it." Daugherty testified that, although Mitchell had previously indicated to Det. Roberts that photo number 2 "sort of look[ed] like the other guy," when Daugherty presented the photospread, Mitchell said, "no, that's definitely him." Mitchell "mentioned about * * * him not being as sleepy and it was, like, lighting [sic] outside," whereas Mitchell was previously shown the photospread "in his kitchen where it was * * * a little bit darker * * *." Daugherty testified that he observed Mitchell circle and initial the photo of Curtis McShann. Daugherty testified that Curtis McShann and Walker had been arrested together the previous day, on October 26, 2016.

{¶ 13} On cross-examination, when asked about the potential names "Damarko or Jamarko," Daugherty testified that Mitchell had stated "Damarko" as a possible name of one of the suspects on the night of the shooting, and then the victim's sister came to the Safety Building and mentioned that her brother had been "with Jamarko Walker earlier in the night when she talked to him on the phone around 8:30."

{¶ 14} On March 15, 2017, the court overruled the motions to suppress. It reasoned:

* * * Detectives Jones and Phillip[s's] method of creating the photospreads * * * and Detectives Roberts, DeBorde [sic] and Daugherty's method of displaying them to the witness Mitchell complied with the express requirements of R.C. 2933.83(B). The Court finds that neither Detective suggested to the witness that the suspect was arrayed in the photospreads much less suggest[ed] whom the witnesses should select from the six photos. The Court find[s] Detective Daugherty's "second" showing of the photospread for purposes of circling the photo was not suggestive since the

exhibit clearly showed the witness had ID'd the suspect the day before.

The Defendants have not shown the photospreads were unduly suggestive. * * *

{¶ 15} The jury trial was held from May 22 through May 26, 2017. The evidence presented was as follows:

{¶ 16} Officer Nathan Speelman of the Dayton Police Department testified that, on October 25, 2016 at 11:43 p.m., he was dispatched to the area of Riverside Drive and Ryburn Avenue on a reported shooting. As he proceeded down Ryburn, Speelman observed a deceased male lying on the north side of the curb in front of 425 Ryburn. The victim was subsequently identified as Brandon Lanier. Speelman stated that he observed "an abundance of shell casings" from multiple weapons in the area and some broken auto glass. Speelman testified that he observed bullet holes in the home at 3325 Riverside Drive and proceeded there to look for more victims. Upon entering the home, Speelman noted that some rounds had entered the residence, and there was visible damage from the bullets. Speelman identified photos of the crime scene, the house on Riverside, and Lanier's body. On cross-examination, Speelman indicated that it also appeared that shooting occurred from inside 3325 Riverside.

{¶ 17} Brittany Depp testified that she was "[c]hilling with friends" at 3325 Riverside Drive on the evening of October 25, 2016. At about 11:00 to 11:30 p.m., she left with two of her friends, "Tisa" and "Mo"; as they approached their van, she felt a tap on her shoulder. Depp testified that when she turned around, she saw a gun and a "mask on the person's face." Depp testified, "He told me, don't move, don't reach for anything and then he asked me what I had on me." Depp testified that she responded, "I got my

phone," and that she pointed to her pocket. She stated that she was on the passenger side of the van with Tisa, and it was very dark outside; she stated that the gun was "big" and "long" and was not a handgun. She stated that she had her hands up, and the assailant retrieved her phone from her pocket. Depp stated that "he just put his hand on my shoulder like don't move. * * * And he walked off."

{¶ 18} According to Depp, at that point, she saw two other "dudes" coming around the front of the van; these two individuals were dressed in black and she could not see their faces. Depp heard "loud voices and then gunshots." Depp testified that it sounded like the gunshots "were coming from everywhere," and she crawled under the van. From that vantage point, she "saw car doors open" and "feet moving really quickly, people jumping into cars, and * * * the car speed off, the gunshots had stopped."

{¶ 19} Depp testified that her hand was bleeding; at the hospital a short time later, she learned that she also had bullet fragments in her chest. Depp testified that she still has bullet fragments in her body, and her hand had been cut on broken glass. At trial, Depp stated that she still "can't really use [her] shoulder as much as I used to as far as lifting," and that she still had pain with "too much movement," including from her job as a home health aide.

{¶ 20} On cross-examination, Depp stated that the two people who came around the front of the van were dressed in all black, and she could not see if they were wearing masks or if they had guns. Depp testified that the car that drove away from the shooting "went up Ryburn, away from Riverside" and had been parked on the other side of the street and facing the opposite direction from the van.

{¶ 21} Keyanday Cunningham was at the home of Germel Hughes on October 25,

2016, for "a little family gathering." Some people were leaving the house, and James Mitchell (known as "Mo") had left the house with a couple of other people. Cunningham testified that he walked toward the door to lock the storm door; the "solid door was open; the storm door was closed." As he did so, before he got to the door, "a person came through the door pointing a gun." Cunningham stated that the man had a black handgun. Cunningham heard the man "say a certain person's name twice and after that he backed out the screen door, the storm door and started shooting through the door." Cunningham testified, "I heard him yelling Dame's name, which was a person that was in the room." Cunningham could not really see the man's his face, because he wore a mask "on from the top of his nose to the bottom." Cunningham testified that there were four or five people in the room with him when bullets came through "the front door, the walls and everywhere." Cunningham "basically just took cover"; he stated that he heard shots coming from more than one gun. Cunningham testified that he "got up and ran behind the bar" and that a bullet struck his lower back. A neighbor took Cunningham to the hospital, where the bullet was removed.

{¶ 22} On cross-examination, Cunningham testified that "Dame" is Damien Franklin, and that Franklin was standing somewhere behind Cunningham in the living room when the shooter entered the home. Cunningham estimated that he was five feet away from the shooter when the shooter entered the home, and he stated that he did not hear gunshots coming from inside the home.

{¶ 23} Germel Hughes testified that in October 2016 he resided on the corner of Ryburn Avenue and Riverside Drive; his home faced Ryburn Avenue but had a Riverside Drive address. Hughes testified that he was familiar with Curtis McShann. He testified

that people began arriving at his home on the night of the shooting around 9:00 p.m. Later that evening, Hughes went into his bedroom to the left of the living room; while he was in the bedroom, "a dark skinned guy with a mask over his face and a handgun" entered the house; Hughes did not know him. Hughes stated that the weapon was an automatic.

{¶ 24} Hughes testified that when the masked man was inside the home, the man pulled the trigger of his handgun, and it clicked but did not fire. At that point, the intruder "walked back outside the house and the next thing you know, bullets got to flying in the air, rapid fire." Hughes stated that he believed multiple guns were being fired and that the shooting lasted ten minutes. After the shooting stopped, he went outside to make sure everybody was all right. A woman named Tyesha was on the ground and had been hit by a bullet in the back of her neck. Hughes testified that he observed a dead body across the street, and it was the same person who had entered his home with the gun. Hughes identified photos of his home depicting a "bunch" of bullet holes that were not there before the shooting.

{¶ 25} On cross-examination, Hughes testified that, after the shooting, he initially followed his friends to the hospital but then turned around and returned to his home. The police were at his home when he returned, and when he got out of the vehicle, he was placed in a cruiser. Hughes stated that he was taken to the police station and interviewed by Det. Daugherty and other officers.

{¶ 26} Letisa Gomez testified that she went to the Riverside address on the night of the shooting with James Mitchell. She stated that she, Mitchell, Tyesha Auster, Brittany Depp and Shakeyla Taylor walked outside the house to a van, and a man walked up to them, pulled a gun out, asked them to get on the ground, and questioned them

about how many people were in the house and who they were. He also asked Gomez where her money was, and she gave him what she could. She stated that she "ended up on the ground in the street, on the other side of the van next to [Mitchell]," having been ordered around to the driver's side.

{¶ 27} Gomez testified that Mitchell had a longer gun pressed on him, with the assailant asking him for his "money and stuff." Gomez testified that she could not see the assailant's faces because it "was just too dark," and "when somebody got a gun to your face, you don't look at [the] face." Gomez testified that she could not tell if the men were wearing masks. She stated that they took Mitchell's money. According to Gomez, "somebody started shooting by the house and it like triggered every shooter." When the shooting began, Gomez stated that she rolled underneath a silver truck across the street. Gomez testified that, after the shooting stopped, she saw men running toward a dark car. After the car left the scene, she observed a body by the curb on the same side as the departing vehicle.

{¶ 28} On cross-examination, Gomez testified that, at the time of the confrontation, she was on the sidewalk getting into the passenger side of the van, Depp was about to get in behind her, and Mitchell was getting into the driver's side. She stated that a man walked up to them and pointed the gun at close range. She stated that she was facing Riverside Drive and the front of the van. She testified that Mitchell had gone around the front of the van to the driver's side before she was confronted with the gun. She stated that while she was laying in street, "the shooting started, the shooter raised his gun from me and towards the house and I rolled under the car" to hide.

{¶ 29} James Mitchell testified that he and Walker had dated the same woman; at

the time of the incident, Mitchell knew Walker but did not know his full name and "was actually calling him Damarko." Mitchell identified Walker as that person. Mitchell testified that he went to Hughes's house on the night of the shooting with Depp and Gomez in his sister's van. They left the house later in the evening, intending to go to night clubs. Mitchell testified that, when he reached the driver's side door of the van, "Jamarko and Curt pulled up with their machine guns." When Mitchell first observed the men, they were "[k]neeled down about my driver's door on the side of the van where you couldn't see them." According to Mitchell, "Jamarko told me to get down on the ground and he then put his machine gun in my back and asked me who all was in the house. How many people was in the house and if [Hughes] was in there?" Mitchell testified that "Curt" took money out of Mitchell's pockets.

{¶ 30} Mitchell testified that the men's faces were not covered and they "just had hoodies tied around their head." He testified that he observed a third person go into Hughes's home with his back toward Mitchell and with what looked like a handgun. That person went inside "for a second," came out, was "playing with the gun," and then started shooting into the house. Mitchell testified that Walker and Curt also began shooting, and shells from their weapons fell around him. According to Mitchell, Walker took the barrel of his gun out of Mitchell's shoulder, raised the gun up, and started shooting; "the van was just rocking" from being hit by bullets. Mitchell testified that there was shooting from behind him and in front of him, and "somebody had to be shooting from the house." Mitchell then observed Walker and Curt get into their vehicle on the opposite side of the street and flee. He stated that he never saw the driver of the vehicle. Mitchell testified that he "got everybody in the van and took them to the hospital." When he was

subsequently interviewed, he told the police what happened and gave them the names "Damarko and Curt."

**{¶ 31}** Mitchell testified that he was shown two photospreads early in the morning of October 26, 2016.   On the first one, he circled photo number 5 (State's Exhibit 92, the photospread of Jamarko McShann), and on the second one, he selected photo number 2 (State's Exhibit 93, the photospread of Curtis McShann).   Mitchell testified that he was shown Exhibit 93 a second time when a detective returned to his home with it, and that he circled photo number 2 at that time.   Mitchell testified that he was shown another photospread on October 27 (Exhibit 94, Walker's photospread), and that he selected photo 3, Walker's photo, as "soon as they flipped the page."   He testified that he wrote on the photospread file that he recognized Walker "as the person who robbed me and held me down with an AK-47 or machine gun."

**{¶ 32}** Mitchell identified a photo of a bruise on his shoulder where Walker had pressed the barrel of the gun.   He described the wallet that was taken from him as a "zombies wallet" that was "black with green and red writing on it," and he identified photos of the wallet, as well as his identification (State's Exhibits 88-90).

**{¶ 33}** On cross-examination, Mitchell stated that the gun pressed into his shoulder "never left till the shooting started," and he did not see anyone in the home with a gun before he left.   He stated that he did not observe the driver's side door of the shooters' vehicle open.   He stated that Walker got into the front passenger side of the vehicle and Curt got into the back passenger door.

**{¶ 34}** Tyesha Auster testified that her boyfriend drove her to Hughes's home on October 25, 2016, and that she was only in the home for five minutes.   She left the home

at the same time as Mitchell, Gomez, Depp, and Taylor. She testified that while she was in front of the home, "some people came out of nowhere, ran up on us, told us to get down." She stated that the "person that came to me told me to * * * just put my hands up on the van," and the person who approached her had a handgun. She put her hands on the passenger-side of the van and she was patted down, but she did not have anything for the man to take. Auster heard shooting and "got down for cover," but was shot in the back of the neck and in the stomach. Auster did not know how many people were on the other side of the van, but she heard men giving similar commands to the people on that side.

{¶ 35} Regarding her injury, Auster testified that she was hospitalized for two weeks and "had to get surgery and get staples in my stomach." She still had a bullet in her stomach, still had pain in her neck and stomach, and was unable to work. Auster stated that she did not get a good look at the person who approached her.

{¶ 36} On cross-examination, Auster testified that the handgun that she observed was black; she did not remember if the person approaching her was wearing mask, and she "just didn't see the face" due to darkness. When asked if she later told detectives that the individual was wearing a mask, she acknowledged that she had.

{¶ 37} City of Dayton Police Officer Brian Updyke testified that he was employed in the forensic services unit of the department and was dispatched to the area of 3325 Riverside Drive on October 25, 2016, after being contacted by Officer Steven Cline, the first evidence technician sent to the scene. Updyke stated that, when he arrived, the scene was secured, and "it was determined that due to the size of the scene, [he] would start photographing." Updyke identified State's Exhibits 2-20 as photos he took at the

scene, including photos of multiple bullet strikes to Hughes's home and of Lanier's body in the street. Once the photos were completed, evidence was tagged and placed in the property room. Defense counsel stipulated to the admission of State's Exhibits 95-153, which were photos of a cell phone and numerous spent shell casings recovered from the scene. Updyke testified that State's Exhibit 62 was a bullet projectile removed from Keyanday Cunningham at Miami Valley Hospital.

{¶ 38} City of Dayton Police Officer Steven Cline testified that he was an evidence technician and was the first to arrive at the scene; he entered the home and observed casings on the floor and bullet holes in the walls. He identified photos taken by him, namely State's Exhibits 21-61.

{¶ 39} Dr. Russell Uptegrove, a forensic pathologist at the Montgomery County Coroner's Office, testified that he performed an autopsy on Lanier on October 26, 2016. He identified a photograph of the upper half of Lanier's body depicting an exit wound from a bullet on the "lateral side of the left chest" (State's Exhibit 160). He further identified a photo depicting an entrance wound "located in the lower right axillary region or a little bit [below] the armpit region on the right side of the body" (State's Exhibit 162). Uptegrove testified to a reasonable degree of medical certainty that Lanier's death was caused by "a perforating gunshot wound to the chest."

{¶ 40} The court read the following stipulation:

Number one, keeper of records. If called to testify, a record custodian from T-Mobile Wireless Communications would testify that the phone records contained in State's Exhibit Number 158 are a complete copy of the records for Curtis McShann, * * * from October 24, 2016 through October

26, 2016, which are kept in their entirety without alterations, modifications or deletions.

The keeper of the records would also testify the records are a fair and accurate copy of the original records which are maintained by T-Mobile Wireless Communications as a business record and those records are kept as a routine course of business.

{¶ 41} Kevin Horan testified that he was a Special Agent with the FBI and "part of a specialized unit out of the FBI Headquarters called the CAST Team or the Cellular Analysis Survey Team." The court designated Horan as an expert in "historical cell phone record analysis, radio frequency theory, cell phone tracking and cellular drive testing." Horan testified that Det. Daugherty asked him to look "at the records and determine where [Curtis McShann's] phone was at or around the time of this crime." Horan identified the report he generated in response to Daugherty's request, and he testified that the cell phone was in the area of the crime scene at the time of the crime and then "migrated from Dayton down to Middletown."

{¶ 42} David House, a homicide detective for the City of Dayton Police Department, testified that he responded to the scene of the shooting to assist and then, later, travelled down to Middletown with Det. Daugherty in an attempt to locate the suspects. House testified that they had identified two named suspects in the homicide and we were tracking a cell phone to one of those suspects, which led them to an apartment building in Middletown. House testified that they were looking for Curtis McShann and Walker. They obtained the name of LaJoyce Morris from McShann's cell phone records, and a Middletown detective verified that she lived in an apartment in the

building. House testified that he, Daugherty, Detectives Via and Schloss, and two Middletown detectives proceeded to the apartment; they located Curtis McShann and Jamarko Walker in the bathroom of the residence. House testified that he retrieved a "zombie" wallet from Walker's right front pants pocket, and he identified State's Exhibits 88-90 as photographs of the wallet taken by him containing Mitchell's identification.

{¶ 43} House testified that a search warrant was subsequently obtained for the apartment. He identified a photo of a couch in the living room of the apartment, which depicted a black semi-automatic handgun in the back left corner of the cushion (State's Exhibit 168). He testified that the gun was a Springfield XD .9 millimeter handgun. House testified that, when he found the weapon, the magazine was inserted, but there were no bullets in the chamber. He further identified a photo of a zippered hooded sweatshirt "which was originally kind of laying on top of the couch where the handgun was discovered"; House interviewed Walker later that day, and Walker indicated that he slept on the couch where the weapon and hooded sweatshirt were found. On cross-examination, when asked if the handgun was fingerprinted, House indicated that "Walker had stated that it was his firearm."

{¶ 44} Chris Monturo, a forensic firearm and toolmark examiner with the Miami Valley Regional Crime Laboratory, testified that he reviewed multiple cartridge cases from the scene to determine if they were fired from the same gun or multiple guns; a firearm was also submitted to him for testing to determine if it was the source of any of the cartridge cases. Monturo testified that "there were multiple cartridge cases, multiple calibers, including 7.62 by 39, a .40 cal, a .9 millimeter – there may have been a 45." Monturo testified that "the 7.62 by 39 is the caliber. The most common firearm is the AK-

47 and the SKS. There are multiple other guns that fire but those are the most common that we see." Monturo testified that when he did his initial inventory of the 7.62 shell casings, there "were multiple brands of ammunition."

**{¶ 45}** Monturo testified that he examined the casings with his comparison microscope. He stated that he found unique characteristics on the 7.62 shell casings from the scene of the shooting. He stated that several of the 7.62 shell casings from the scene were fired from the same weapon, and that there were also other 7.62 shell casings from the scene that were fired by a different weapon. Monturo identified State's Exhibit 175 as the .9 millimeter handgun from the scene that he analyzed. He testified that he confirmed the operability of the weapon and collected the shell casings and bullets from his test fires. He testified that he compared the test-fired rounds to the rounds from the scene microscopically. Monturo testified to a reasonable degree of scientific certainty that the handgun fired the shell casings that he marked "1-double-D through 1-double-PP." On cross-examination, Monturo testified that he only analyzed one firearm in this matter. On redirect examination, based upon all the shell casings that he analyzed, Monturo testified that there were at least five guns that were fired at the crime scene.

**{¶ 46}** Det. Daugherty testified that, when he observed Lanier's body at the scene, there was a black tee shirt that "was tied, like the sleeves of the shirt were tied in the back like it had been worn like a mask or something." He described apprehending McShann and Walker at the apartment in Middletown. He testified that both men were in the bathroom with no lights, and that he ordered them out and cuffed them on the bedroom floor.

**{¶ 47}** Daugherty further testified that he interviewed Walker at the Safety Building

on October 26, 2016, after going over the standard pre-interview form with him and each of his rights. Daugherty testified that he advised Walker why he was there and showed him a photo of Lanier. Daugherty testified that Walker stated that Lanier was his cousin, and Walker had seen Lanier two or three days earlier. Daugherty testified that, when he asked Walker about Mitchell's wallet being found on his person, Walker stated that Mitchell was his friend, Mitchell had left his wallet and identification in Walker's car the day before, and Walker was planning to return it to Mitchell. When Daugherty told Walker that Mitchell indicated his wallet had been taken in a robbery and that other people had been shot, Walker denied robbing anyone, then said that he had gotten into a fight with Mitchell the day before in an apartment complex; Walker claimed to have inadvertently picked up Mitchell's wallet after the fight. Daugherty testified that Walker denied being at the scene of the shooting and stated that he had spent some time with his girlfriend at the time of the shooting. Daugherty testified that, after Walker repeatedly changed his story, Walker then said, "Let's start over. I'm going to be honest with you now."

{¶ 48} When Daugherty asked Walker if any of the 9mm shell casings found at the scene would match the 9mm weapon retrieved from the apartment, Walker told him, "it's my gun but my people had it"; Daugherty testified that Walker stated that he had given the gun to Lanier "because his cousin had the beef with Mel at the house there on Riverside and Ryburn." Walker denied firing the weapon.

{¶ 49} A DVD of Daugherty's interview with Walker was played for the jury and is part of the record in this case. In the course of the interview, Walker told detectives that he gave his 9mm handgun to Lanier at the scene of the shooting, before Lanier got out

of the car, that Walker stayed in the vehicle, and that he retrieved the gun from Lanier after he was shot.

**{¶ 50}** At the conclusion of the recorded interview, the prosecutor asked Det. Daugherty if the weapon was sent for DNA analysis; Daugherty answered negatively. According to Daugherty, detectives knew that Walker "didn't have a handgun out at the scene," but instead had a rifle, so DNA analysis "wouldn't have benefitted the case."

**{¶ 51}** On cross-examination, the following exchange occurred:

[DEFENSE COUNSEL].   As part of your investigation, did you speak to Curtis McShann?

[DAUGHERTY].   Yes.

Q.   Were you made aware that Curtis McShann has a brother named Jamarko McShann?

A.   Yes.

* * *

Q.   Detective, what, if any, investigation did you do in reference to Jamarko McShann.

A.   I interviewed him.

Q. * * * Was that interview audio and video recorded?

A.   It was audio recorded.

Q.   * * * That audio recording - - that was part of this investigation, correct?

A.   Yes.

Q.   Did you turn that audio recording over to the prosecutors?

A.   I believe so.

[DEFENSE COUNSEL]:   Your Honor, can I approach briefly?

THE COURT:   Sure.

{¶ 52} Defense counsel represented to the court at sidebar that he was uncertain whether or not he received a recording of the interview with Jamarko McShann, and he asked for an opportunity to check his file. The following exchange occurred:

THE COURT:   Well, here's the situation.   I'll let you finish the testimony of this witness.   Let's assume that you did receive it.

[DEFENSE COUNSEL]:   Sure.

THE COURT:   Then we'll make a record regarding that, as well. And you will be able to recall this witness about anything related to that matter.   And if the court finds there's anything particularly in there that would allow or require you to subpoena someone else, we'll take the time to get what we need done done. * * *

{¶ 53} The following exchange occurred:

[DEFENSE COUNSEL].   At some point in your investigation, you did come by information that * * * on the night of this incident that Curtis was actually with his brother Jamarko; didn't you?

[DAUGHERTY].   He * * * made statements that he was at his brother's apartment.

Q.   * * * Did you follow up on that?

A.   Yeah, I talked to his brother about it.

{¶ 54} Daugherty acknowledged that Auster told him in the course of an interview

at the hospital that four men approached her with guns, and that the two on the passenger side of the van had their faces covered.

{¶ 55} At the conclusion of Daugherty's testimony, outside the presence of the jury, it was determined that the Jamarko McShann interview had not been included in discovery. Daugherty represented that the recording of the 25-minute interview was preserved on his phone. Daugherty indicated that he would return to his office and "burn" a CD of the interview for defense counsel. Defense counsel was to be given time in the morning, after he reviewed the CD, to speak to his client before the proceedings resumed.

{¶ 56} The following day, outside of the presence of the jury, the court indicated as follows regarding the Jamarko McShann interview:

At the outset, as the Court, frankly, indicated to counsel, this Court is very familiar with all the mechanics both from the defense side and from the State of Ohio side that go into a trial of this magnitude. And the Court notes that Det. Daugherty was the one who brought this to our attention, so therefore, obviously, him not turning over the audio wasn't an intention[al] act of nondisclosure; however, it happened. Stuff happens.

{¶ 57} The court then asked defense counsel for Walker's position on the issue, and the following exchange occurred:

[DEFENSE COUNSEL]: * * * I think at the outset that Mr. Walker has been prejudiced in several ways. One being that it would've given myself an opportunity to do more investigation. There's some references on this audio of names that I've never heard before, not on the witness list, not in any of our police reports, including what the State has.

It would've given me an opportunity to at least go out and look at those people. Again, people I had no idea until I listened to the audio yesterday.

THE COURT: * * * Just so that I'm clear about that. There were names given, but in what context were they given that it could've been material to the case?

[DEFENSE COUNSEL]: Mr. Jamarko McShann stated that * * * on the night of the incident, he went to so and so's house, and he wasn't on the scene.

THE COURT: So names that would potentially establish an alibi - -

[DEFENSE COUNSEL]: For him.

* * *

THE COURT: - - and your position would be that if you had the opportunity to talk to them, and they said that's not true, then his credibility comes into issue and his whereabouts come into issue.

[DEFENSE COUNSEL]: Right. And then, you know, potentially then a decision could've been made to call him.

THE COURT: I understand.

[DEFENSE COUNSEL]: * * * Another type of prejudice that I believe * * * Mr. Walker has experienced is an opportunity to ask witnesses up on this stand questions and the - - I guess the specific facts around that, Judge, is on this audio we hear Det. Daugherty talk to Jamarko McShann about some of the witnesses in this case that just say witnesses. Daugherty only

says "witnesses" threatened - - were threatened by Jamarko McShann at the [K-9] Club. I don't know what witnesses they are. It's been presented to me - - I have no reason to think this isn't true. It's been presented to me this morning that that one witness is James Mitchell. Obviously I take them for that word [sic], but I also - - you know, I obviously could've asked other witnesses that question if that, in fact, were true.

I think the Court has indicated * * * a willingness to cure the prejudice, if there is any, as it relates to Mitchell that I could call him if I want - - recall him if I wanted.

THE COURT: I think that * * * the clear intent of that - - I would extend that to any witness that you can think - -

* * *

THE COURT: - - that it was relevant to recall. * * *

* * *

THE COURT: I've also indicated for the record that I would permit you to call these witnesses as hostile witnesses so that you can cross them - -

* * *

THE COURT: - - just as if you were crossing them in the State's case in chief.

* * *

THE COURT: - - that include[s] James Mitchell. * * *

* * *

[DEFENSE COUNSEL]: * * * The issue of whether or not this came up, like you said, * * * - - [Det. Daugherty] brought it up himself on the stand. But it came up in my cross-examination * * *.

The plan that we went forward or the procedure we went through, I finished, [the prosecutor] got back up. I asked the Court that if we - - because we stopped in the middle of * * * redirect, and if we come back to court and start off this morning, and * * * Det. Daugherty's on the stand, I believe that I have an opportunity or I have the right to start that questioning of Det. Daugherty to bring it to light because it happened in my cross-examination.

It's my understanding the Court is going to grant that wish. If that's the case, then that prejudice obviously goes away.

THE COURT: * * * I indicated off the record that I would grant that request. I'll note that the granting of that request was over the objection of the State of Ohio, who thinks * * * we should just continue on with the redirect and then cross. I understand that * * *. The Court also understands that the rules permit the Court to control the mode and manner of the testimony in the case, and given this unusual circumstance, I believe that that's the right thing to do for Mr. Walker and for the fairness of this trial in total. So I will permit you to do that now. * * *

* * *

[DEFENSE COUNSEL]: - - I've had a lengthy conversation this morning with Mr. Walker. He understands each and every opportunity and

things that we could have done potentially. He understands every possible way that he could have been prejudiced or was prejudiced in this case, and he is in agreement with me, and we have together agreed that if the Court allows us to have a little leeway with just Det. Daugherty and understanding the rulings about the witnesses in my case in chief, that we are satisfied moving forward in that regard, and it's understood, * * * and Mr. Walker understands that, and I think the record needs to be clear about that.

THE COURT: Well, I guess, Mr. Walker, just so that we can make a record here.

* * * - - the issue that [Defense Counsel] is kind of skirting around, but * * * I suspect that he was pretty direct with you about it is you could make a motion for a mistrial now, and the Court would consider everything that has been said and make a decision about whether I would grant a mistrial then.

A mistrial doesn't mean that the case is over. It just means that it gets rescheduled for trial down the road, typically subject to whatever motions the defense may make. They may make an argument * * * that it should be with prejudice. I get all of that.

But what the Court hasn't represented to your lawyer is that I am going to give leeway in several regards. First, I'm not rushing this trial at all. This is your life, and I get that. So if we need to take time and for you to get witnesses in here to put on this stand so your attorney can ask them the questions he wants to ask them now that he has had the opportunity to

view this, I'll give you all the time you want. * * *

The other thing that I indicated to your attorney was that I'm going to give some leeway. I don't know that he's going to use this leeway, but over the objection of the State of Ohio, and I know you have to make your record, [Prosecutors], I understand that, but I'm going to give some leeway about hearsay, as well. Only because of what's happened here, I think I'm going to give a little leeway. That's the - - these matters are within my discretion to do, and I'm going to do it.

So you have had these discussions with [Defense Counsel], I take it, Mr. Walker?

THE DEFENDANT: Yes, sir.

THE COURT: And is it your desire to continue with this trial, as [Defense Counsel] has represented to us?

THE DEFENDANT: Yes, sir.

THE COURT: And not request a mistrial?

THE DEFENDANT: Yes, sir.

{¶ 58} After the court asked the State if it had anything further to add, the prosecutor noted to the court that "the name of Jamarko McShann did not come up for the first time late afternoon. In fact, it had been in the case in the discovery by virtue of Mr. Jamarko McShann's photograph being selected in a photospread shown to a witness." The prosecutor further noted that "as it relates to any potential prejudice in the matter, [in] the interview with Jamarko McShann, Mr. McShann denies being at the crime scene. * * * He does not say that he was with this particular Defendant, Jamarko Walker.

In fact, he denies it." According to the prosecutor, Jamarko McShann "wasn't providing an alibi for Mr. Walker. And moreover, the evidence in this case shows that the Defendant places himself at the crime scene by his own admissions. So it would be our position that there was no prejudice as it relates to that."

{¶ 59} The prosecutor then advised the court that the parties had agreed to a stipulation related to Count XXI, weapons under disability, which was to be tried to the bench. According to the prosecutor, the record in Case No. 2014-CR-3733, specifically an order dated May 18, 2015, reflects that Walker was placed on and remained intervention in lieu of conviction for the offense of possession of cocaine, a felony in the fifth degree. Defense counsel acknowledged the stipulation, and the court accepted it.

{¶ 60} At the conclusion of the above exchanges, the court permitted defense counsel to cross-examine Daugherty further. The following exchange occurred:

Q. And you mentioned to us that you had interview[ed] Jamarko McShann and that you had audio recorded that interview, correct?

A. Yes.

Q. And as I stand here now, I understand that you've had that audio, and you never turned it over to the State, and you never turned it over to me.

A. Correct.

Q. * * * And as I sit here now, detective, I know you. That's not an intentional mislead, correct?

A. Correct. It was - -

* * *

A. - - an oversight on my part.

Q. * * * Can I ask you though, when did that interview take place?

A.  It was January 11, 2017.

* * *

Q.  * * * After January of 2017, did you go out and speak to Jamarko McShann anymore?

A.  No.

{¶ 61} On further redirect examination, Daugherty testified that it is difficult to obtain fingerprints on a handgun, and the following exchange occurred:

Q.  And why is that?

A.  The texture of the gun and where people hold it, like, on the grip, it's not * * * like, a smooth surface.   It's usually a roughed-up surface of the grip, which is where * * * people typically put their hands at.

* * *

Q.  Are defense attorneys able to ask for testing to be done on objects?

A.  Yes.

* * *

Q.  Was there ever any request in this case from the defense to have any piece of evidence tested scientifically at the lab?

A.  No.

{¶ 62}  Daugherty testified that no one in the course of his investigation admitted to firing a weapon from inside Hughes's home or seeing someone fire a weapon from

inside.

{¶ 63} In the course of a subsequent sidebar, the following exchange occurred:

[DEFENSE COUNSEL]:  While we're here, I want to make an objection that I strategically did not want to make in front of the jury because that already came out. * * *

* * *

THE COURT: Say that again.

[DEFENSE COUNSEL]:  The line of questioning to Det. Daugherty about [a] defense attorney being allowed to get something tested, having him go test it, I think that skirts the line of putting the burden on the Defendant.  So I just want to make the record that I think that that's inappropriate.

THE COURT:  Well, wait a minute.  Wait a minute.

[DEFENSE COUNSEL]:  It's going to be argued in argument. So - -

THE COURT:  With all due respect, * * * the cat's out of the cage.

[DEFENSE COUNSEL]:  I agree with you.  Judge, I agree.

THE COURT:  You had time to object to it at the time it was coming.  I wondered about it.  The objection was not made.  I would've had to think about it at that time - -

[DEFENSE COUNSEL]:  I agree with you, Judge.

THE COURT: - - but it wasn't made, so I think it's moot.

{¶ 64} After State's Exhibits 1-185 were admitted, defense counsel moved for acquittal, asserting, "I still believe based on all of the testimony we have one individual -

- one individual who puts a gun in * * * Mr. Walker's hands during this entire incident * * *." The court overruled the motion for acquittal. On the State's motion, the trial court dismissed Count 8, the robbery of Shakeyla Taylor, because Taylor did not appear and testify.

{¶ 65} Walker then called Homicide Detective Nathan A. Via. The following exchange occurred regarding Via's interview of Mitchell:

Q. And did Mr. Mitchell tell you that he was confronted by three black males dressed in black?

A. Yes.

Q. Did he tell you that Damarko * * * began to go through his right side pockets?

A. That Damarko went through? No. He said left.

Q. * * * So he did say Damarko?

A. * * * I believe he called him Jamarko or Damarko.

* * *

A. It was one of the two.

Q. It wasn't Curt, right?

A. No.

{¶ 66} On cross-examination, Via testified that Mitchell stated that two of the three men confronted him with machine guns and that "they both went through his pockets." Via also testified that Mitchell told him the third man walked across the lawn to the front door of Hughes's home.

{¶ 67} Walker also called City of Dayton Police Officer Sara Von Holle, who

testified that she interviewed Gomez at the scene, and Gomez told her that she was robbed by men with their faces covered. On cross-examination, after Von Holle reviewed the video from her cruiser camera of her interview with Gomez outside of the presence of the jury, Von Holle testified that Gomez "said they couldn't see anything. They were faced - - or laid out face down." Von Holle acknowledged that Gomez never mentioned the word "mask" or the assailants having their faces covered in the interview.

{¶ 68} Finally, Detective Rod Roberts of the Dayton Police Department testified that he was involved with the investigation into Lanier's homicide. He stated that he initially responded to the scene of the shooting shortly before midnight and then proceeded to Good Samaritan Hospital, where he interviewed Depp. Roberts testified that Depp stated that she was approached by a tall, thin, black male with a mask covering his face. Roberts further testified that he interviewed Cunningham at the hospital. He stated that he showed photospreads (State's Exhibits 92 and 93) to James Mitchell on October 26, 2016. Regarding State's Exhibit 92, Jamarko McShann's photospread, the following exchange occurred:

Q. And the words that are listed there after photo 5 and then it's check marked yes, the words there who wrote that, first of all?

A. I did.

Q. * * * And do you recall - - you put the words looks like him, pretty sure.

A. Yes.

Q. Are those the words that James Mitchell used to you that day?

A. Yes, sir.

Q.   * * * I want to go back to the second page. * * *

* * *

Q.   * * * And then the same thing here at the top underneath the number 5 there I see words looks like him, guy outside with gun.   Did you write that?

A.   Yes, sir.

Q.   Are those the words that James Mitchell used to you?

A.   Yes.

Q. * * * And just for the purposes of the record who did James Mitchell pick out of that photospread?

* * *

A.   Jamarko McDwayne (phonetic) McShann.

**{¶ 69}** Regarding State's Exhibit 93, Curtis McShann's photospread, Roberts testified that Mitchell used the words "sort of looks like the other guy" and selected the photograph of Curtis Maurice McShann, Jr.   On cross-examination, when asked about the circumstances of showing the photos to Mitchell, Roberts testified that it was "7:08 in the morning when I showed it to him.   So I beat on the door at 7:00.   An elderly woman answered the door.   She went back inside. * * * And then Mr. Mitchell came out in some boxer shorts sort of wiping his eyes like he had been asleep. We went into the kitchen and I showed him the photospread in their kitchen dining room area."   Roberts testified that it was dark outside and the lighting inside "wasn't as bright as in here."

**{¶ 70}** The jury found Walker guilty of four counts of murder (Counts 1-4); aggravated burglary (Count 5); three counts of aggravated robbery (Counts 6, 7, and 9),

eight counts of felonious assault (Counts 11-18); improper discharge of a firearm at or into a habitation (Count 19); and discharge of a firearm at or near a prohibited premises (Count 20).[2]   On each of these counts, the jury also found Walker guilty of a firearm specification.   Finally, the trial court found Walker guilty of having weapons while under disability (Count 21), an offense on which he had waived his right to a jury trial.

{¶ 71} The trial court merged numerous offenses for purposes of sentencing.   It sentenced Walker to 15 years to life on Count I, plus three years on the firearm specification, to be served prior and consecutively to the definite term of imprisonment; ten years each on Counts 5, 6, 7, and 9, plus three years on the firearm specifications, all to be served concurrently with Count 1; eight years on Count 16, plus three years on the firearm specification, to be served concurrently with Count I; eight years on Counts 17 and 18, plus three years on the firearm specifications, to run concurrently to Count 1 and to be served consecutively and prior to the definite term of imprisonment, and consecutively to the firearm specification in Count 1; 10 years on Count 20, plus three years on the firearm specification, to run concurrently with Count 1; and 36 months on Count 21, plus three years on the firearm specification, to run concurrently with Count 1. The aggregate term of imprisonment was 24 years to life.

{¶ 72} Walker appeals. Both parties filed briefs; additionally, Walker filed a response and an amended response to the State's brief.   Walker raises four assignments

---

[2] As noted above, Count 8 (aggravated robbery) was dismissed.   The jury found Walker not guilty of Count 10 (aggravated robbery), which charged him with removal or attempted removal of personal items from the occupants of 3325 Riverside Drive.   On the felonious assaults reflected in Counts 13 and 14, Walker was indicted pursuant to R.C. 2903.11(A)(2)(serious physical harm), but the verdict entry and judgment entry of conviction describe these offenses as violations of R.C. 2903.11(A)(1)(felonious assault with a deadly weapon).

of error. For ease of analysis, we will consider Walker's fourth assignment of error first. It is as follows:

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION TO SUPPRESS AS IT RELATE[D] TO A PHOTO SPREAD.

{¶ 73} Walker asserts that, when James Mitchell was presented with the first photospread, he picked out Jamarko McShann, and "[o]nly after being influenced by a Detective did James Mitchell identify [Walker] in the photo spread." On this basis, he contends that the identification should have been excluded.

{¶ 74} The State responds that the testimony presented at the suppression hearing refutes Walker's assertion that Mitchell's identification of Walker was the result of police influence. According to the State, although Walker claimed that some "unnamed 'Detective' " influenced Mitchell's selection, it was not possible for either Det. Debord or Det. Phillips to have done so. Moreover, the State asserts that, even if the procedure was somehow defective, Mitchell's identification of Walker was still reliable because Mitchell had the opportunity "to view Walker's face at close quarters for an extended period of time." The State also notes that Walker was not a complete stranger to Mitchell, as evidenced by Mitchell's ability to tell police in the hours after the shooting that one of the assailants was "Damarko" or "Jamarko."

{¶ 75} In reply, Walker asserts that the first photospread, which contained Curtis McShann's picture, prejudiced Mitchell's selection of Walker from a subsequent photospread, because "his photograph was so similar to his brother's" that the identification suffered from infirmities similar to those found "in prejudicial one-photo identifications."

**{¶ 76}** This Court has previously noted:

"Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The defendant must first show that the identification procedure was unduly suggestive. "A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection." (Citations omitted.) *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208. If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Id.* at ¶ 209; *State v. Williams*, 2d Dist. Montgomery No. 26357, 2015-Ohio-1403, ¶ 13.

If, on the other hand, the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. *Id.* In reviewing the likelihood that the circumstances resulted in a misidentification, courts consider the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length

of time between the crime and the confrontation. *Neil* at 199-200, 93 S.Ct. 375; *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Chaffin*, 2d Dist. Montgomery No. 25220, 2014-Ohio-2671, ¶ 16.

Reliability of the pretrial identification is the linchpin in determining its admissibility. *Manson* at 114, 97 S.Ct. 2243. "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002).

We review a trial court's refusal to suppress a pretrial identification for an abuse of discretion. *State v. Wilson*, 2d Dist. Montgomery No. 22624, 2009-Ohio-1038, ¶ 19.

(Footnote omitted.) *State v. Frazier*, 2d Dist. Montgomery Nos. 26495, 26296, 2016-Ohio-727, ¶16-20.

**{¶ 77}** This Court has further noted:

An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. (Citation omitted.) *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

*State v. Rush*, 2d Dist. Greene No. 2015-CA-54, 2016-Ohio-4895, ¶ 8.

**{¶ 78}** We conclude that the photospread at issue and the procedure used when it was shown to Mitchell were not unduly suggestive, and that the trial court did not err in overruling Walker's motion to suppress. "[A] computerized method of creating photo spreads avoids most potential unfairness and almost any claim that the lineup was suggestive." *State v. Carter*, 2d Dist. Montgomery No. 2006-Ohio-2823, ¶ 34, citing *State v. Beckham,* 2d Dist. Montgomery No. 19544, 2003-Ohio-3837 and *State v. Beddow,* 2d Dist. Montgomery Nos. 16197 & 16198, 1998 WL 126876 (Mar. 20, 1998). Moreover, "[a] defendant in a lineup need not be surrounded by people nearly identical in appearance." *State v. Davis,* 76 Ohio St.3d 107, 112, 666 N.E.2d 1099 (1996).

**{¶ 79}** Phillips testified that he prepared a photospread containing Walker's photograph using the computer program Justice Web, which displayed subjects with features similar to Walker's, and that he relied upon the program's default parameters. Phillips testified that the "key" to the photospread was maintained separately from the photos. Debord testified that he knew nothing about the investigation, that he was never shown photos of any suspects, and that he was a blind administrator. *See* R.C. 2933.83(B). He testified that Mitchell "fairly quickly" identified Walker, stating "That's Jamarko." Mitchell wrote on the document that he recognized the person in "photo number 3" as the person who robbed him and held him down with an AK-47 or machine gun. Debord testified that he did nothing to influence Mitchell's selection. Det. Daugherty's testimony regarding the creation and display of the photospread was consistent with Phillips's and Debord's. The fact that Mitchell was shown the McShann photospreads the previous day did not diminish the reliability of Mitchell's identification of

Walker the following day; Debord testified that Mitchell was certain that Walker held him down at gunpoint.

{¶ 80} We have reviewed the photospreads and, to the extent that Walker appears to suggest that his photo resembles or is similar to Jamarko McShann's photo, leading Mitchell to select Walker, we disagree. Since law enforcement did nothing to steer Mitchell to one suspect, independent of the witness's honest recollection, the lineup was not unduly suggestive, and no further analysis was required.

{¶ 81} Walker's fourth assignment of error is overruled.

{¶ 82} We will next consider Walker's third assignment of error:

COUNSEL FOR THE DEFENDANT WAS INEFFECTIVE AS HE FAILED TO REQUEST A MISTRIAL WHEN NEW DISCOVERY IS MADE KNOWN [SIC] AT THE TIME OF TRIAL AND MAKE PROPER OBJECTIONS.

{¶ 83} Walker argues that defense counsel should have requested a mistrial when he learned that there was an interview of Jamarko McShann which was not provided to the defense, because he was "substantially prejudiced" by the State's failure to disclose all discovery prior to trial. Walker also argues that the trial court erred in not declaring a mistrial when it knew he had not been provided all discovery before trial, in violation of his *Brady* rights. Further, Walker argues that defense counsel was ineffective in failing to object to a question from the State about whether the defense had asked "to have any piece of evidence tested scientifically at the lab?" because he had a constitutional right not to prove anything at trial.

{¶ 84} According to the State, the record reflects that "the decision to not seek a

mistrial was not trial counsel's alone. Rather, the decision to continue with the trial was ultimately Walker's own, after discussing the matter fully with his attorney." The State also points out that the trial court conducted a thorough colloquy with Walker about this issue, and Walker confirmed that it was his desire to proceed with trial. According to the State, the fact that "the supposed blunder by trial counsel" was actually an informed decision by Walker undercuts any ineffective assistance argument. Finally, the State asserts that any motion for a mistrial was unlikely to have been granted.

{¶ 85} Regarding the question about lab testing, the State asserts that, even assuming for sake of argument that the question was improper, Walker was not prejudiced by his counsel's failure to object, because the trial court instructed the jury that the burden rested with the State to establish Walker's guilt beyond a reasonable doubt. The State argues that "the question was an isolated exchange in the midst of days' worth of testimony," and that there was substantial independent evidence of Walker's guilt, including his identification by Mitchell as one of the shooters and the circumstantial evidence that Walker was one of the perpetrators.

{¶ 86} As this Court has noted:

We evaluate ineffective assistance of counsel arguments in light of the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). To prevail on his claims of ineffective assistance of counsel, [a defendant] must show that counsel's representation fell below an objective standard of reasonableness, and that he was prejudiced by counsel's deficient performance. *Bradley*, at 142.

To establish the first prong of ineffective assistance, there must be "a substantial violation of any of counsel's essential duties to his client. *Bradley* at 141. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Id.* at 142. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *Bradley* at 689.

To establish the second prong, prejudice, [a defendant] "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland* at 694.

*State v. Jordan*, 2d Dist. Montgomery No. 27208, 2017-Ohio-7342, ¶ 20-22.

{¶ 87} Crim.R. 16(L)(1), related to regulation of discovery, provides:

The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

{¶ 88} The Supreme Court of Ohio has further noted:

The overall objective of the criminal rules " 'is to remove the element of gamesmanship from a trial.' "  *Lakewood* [*v. Papadelis*], 32 Ohio St.3d [1], 3, 511 N.E.2d 1138, quoting *State v. Howard,* 56 Ohio St.2d 328, 333, 383 N.E.2d 912 (1978). The purpose of the discovery rules "is to prevent surprise and the secreting of evidence favorable to one party." *Id.*

*State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 19.

**{¶ 89}**  As noted in *Darmond*:

The holding in *Lakewood v. Papadelis,* 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), paragraph two of the syllabus, that "[a] trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery" applies equally to discovery violations committed by the state and to discovery violations committed by a criminal defendant.

*Id*. at syllabus.

**{¶ 90}** *Darmond* noted that a "trial court has discretion in determining a sanction for a discovery violation."  *Id*. at ¶ 33, citing *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983).  It further noted:

In *Parson,* * * * we established three factors that should govern a trial court's exercise of discretion in imposing a sanction for a discovery violation committed by the prosecution. The three *Parson* factors a judge should consider are (1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would

have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced. *Id.* at syllabus. *See also State v. Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 115.

*Id.* at ¶ 35.

**{¶ 91}** We cannot conclude that Walker has established a substantial violation of any of defense counsel's essential duties. The record reflects that defense counsel brought the absence of Jamarko McShann's interview from discovery to the court's attention as soon as he became aware of it. It appears from the record that Det. Daugherty did not deliberately withhold Jamarko McShann's interview, but that it was an oversight, as the court and defense counsel acknowledged. In other words, there was no "gamesmanship" or intentional secreting of evidence favorable to the State.

**{¶ 92}** Defense counsel initially argued that Walker was prejudiced in specific ways. The court advised defense counsel that he would allow him to subpoena any witnesses as on cross-examination and continue his examination of Daugherty. Defense counsel subsequently indicated to the court that he had had a "lengthy conversation" with Walker about the issue, and that Walker understood "every possible way that he could have been prejudiced or was prejudiced in this case," and that Walker agreed with counsel that, if the Court gave them "a little leeway with just Det. Daugherty and understanding the rulings about the witnesses in my case in chief," they were "satisfied moving forward." Walker confirmed in a colloquy with the court that he did not want to proceed with a motion for a mistrial. Walker made an informed decision, undercutting his assertion that defense counsel's performance was deficient. *See State v. Hayes*, 2d Dist. Montgomery No. 27776, 2018-Ohio-3399, ¶ 27 (where a tactical decision was made

after consultation with defense counsel and with knowledge of the peril involved, a defendant cannot claim on appeal that he received ineffective assistance "when his counsel was merely acting at his behest.")

{¶ 93} Even if we were to conclude that defense counsel's performance was deficient (which we do not), Walker has not demonstrated that, if he had moved for a mistrial, the outcome of the proceeding would have been different. Defense counsel did not dispute the prosecutor's assertion that Jamarko McShann did not provide an alibi for Walker on the night of the incident, and we cannot conclude that foreknowledge of the undisclosed interview would have benefitted Walker, or that he was prejudiced by the State's inadvertent failure to disclose it. In other words, ineffective assistance of counsel is not demonstrated.

{¶ 94} Finally, we turn to Walker's assertion that defense counsel was ineffective in failing to object to the prosecutor's question to Det. Daugherty on redirect examination regarding whether the defense ever requested to have any piece of evidence scientifically tested. We conclude that the trial court correctly determined that defense counsel failed to timely object to the question, and that Walker waived all but plain error. "In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights." *State v. Henley*, 2d Dist. Montgomery No. 26604, 2015-Ohio-4113, ¶ 10, citing *State v. Barnes,* 94 Ohio St.3d 21, 2002-Ohio-68, 759 N.E.2d 1240. Under the plain error doctrine, errors or defects affecting substantial rights may be noticed on appeal although they were not brought to the attention of the trial court. *Id.*, citing Crim. R. 52(B).

{¶ 95} Plain error is not demonstrated. The question was an isolated one, and

given the overwhelming evidence of Walker's guilt (as discussed thoroughly below) we cannot conclude that counsel's failure to timely object to the question affected Walker's substantial rights.   Finally, the trial court instructed the jury that a defendant is presumed innocent until his guilt is established beyond a reasonable doubt, and the defendant "must be acquitted unless *the State produces evidence that convinces you beyond a reasonable doubt of every essential element* of the offenses charged in the indictment." (Emphasis added). Ohio has consistently held that juries are presumed to follow the court's instructions. *State v. Wood*, 2d Dist. Clark No. 2016-CA-69, 2018-Ohio-875, ¶ 67. Ineffective assistance of counsel is not demonstrated, and Walker's third assignment of error is accordingly overruled.

{¶ 96} We will consider Walker's first and second assignments of error together. They are as follows:

THE JURY ERRED WHEN IT FOUND APPELLANT GUILTY OF MURDER (PROXIMATE RESULT), BURGLARY (DEADLY WEAPON), ROBBERY (DEADLY WEAPON), ASSAULT (SERIOUS HARM), DISCHARGE OF A FIREARM ON OR NEAR PROHIBITED PREMISES AND HAVING WEAPONS UNDER DISABILITY (PRIOR DRUG CONVICTION) AS SUCH A FINDING IS AGAINST THE MANIFEST AND/OR SUFFICIENT WEIGHT OF THE EVIDENCE AND THE EVIDENCE PRESENTED WAS INSUFFICIENT TO SUPPORT THE CONVICTION.

THE JURY ERRED WHEN IT ENTERED JUDGMENT OF CONVICTION FOR CRIME DESPITE A FAILURE BY THE STATE TO

PRODUCE EVIDENCE THAT THE DEFENDANT FIRED A FIREARM AND PARTICIPATED IN A CRIME.

{¶ 97} In his first assignment of error, Walker asserts that, because the evidence presented at trial was insufficient to support his convictions, the verdicts were against the manifest of the evidence and supported by insufficient evidence.  In his second assignment of error, Walker asserts that there was no evidence connecting him to the crime, such as firearm testing, fingerprints, or DNA evidence, and that the victims provided inconsistent accounts of the incident and descriptions of the perpetrators.

{¶ 98} Walker repeats his argument discussed above that Mitchell initially selected Jamarko McShann from the photospread and only chose Walker "after being influenced by a Detective." According to Walker, Mitchell testified that his two assailants did not wear masks, and he "identified them as 'Jamarko' and 'Curt.' * * * During the first photo spread, it is to be noted that James Mitchell picked out 'Jamarko McShann' and not 'Jamarko Walker.' " However, Walker's photo was not in the first two photospreads. Having concluded above that Mitchell's identification of Walker was reliable, we will not address this argument again.

{¶ 99} Walker also argues that Gomez and Auster testified that the assailants' faces were covered and that Mitchell was on the ground "with his face down."  Walker asserts that Gomez "had difficulty identifying" him and did not see any guns and that other witnesses were unable to identify him.  Walker further asserts that as there was no firearm, fingerprint, DNA, or other testing that provided conclusive evidence that he participated in these events, and he had "a valid actual innocence claim."

{¶ 100} The State responds that there was overwhelming evidence that Walker

participated in the robbery and shooting, and his arguments are without merit.

{¶ 101} This Court has previously noted:

When a conviction is challenged as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In a manifest-weight analysis, the credibility of the witnesses and the weight to be given to their testimony are primarily for the trier of facts to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that a substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses." *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 477684, *5 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way. *State v. Bradley,* 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510

(Oct. 24, 1997). * * *

*State v. Nelson*, 2d Dist. Greene No. 2014-CA-7, 2015-Ohio-113, ¶ 29.

{¶ 102} Regarding the sufficiency of the evidence, this Court has previously stated:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). When reviewing whether the State has presented sufficient evidence to support a conviction, "the relevant inquiry is whether any rational finder of fact, after viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A guilty verdict will not be disturbed on appeal unless, "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

*State v. Wilson*, 2d Dist. Montgomery No. 27001, 2016-Ohio-7329, ¶ 6.

{¶ 103} We initially note that the jury was instructed regarding complicity, consistent with R.C. 2923.03, which provides:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

* * *

(2) Aid or abet another in committing the offense[.]

* * *

(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.

{¶ 104} For ease of analysis, we will consider Walker's convictions out of order.

<u>Aggravated Robbery</u>

{¶ 105} R.C. 2911.01 proscribes aggravated robbery and provides:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon[3] on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]

{¶ 106} Walker was convicted of three counts of aggravated robbery. According to the bill of particulars, Count 6 related to the theft of Mitchell's wallet; Count 7 related to the theft of Depp's cell phone; and Count 9 related to "personal items that were removed or attempted to be removed from" Auster.

{¶ 107} Regarding Count 6, Mitchell testified that "Jamarko and Curt pulled up with their machine guns," and that "Jamarko told me to get down on the ground and he then put his machine gun in my back * * * ." Mitchell testified that Curtis McShann took money

---

[3] Deadly weapon "means any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).

out of his pockets. He testified that the men's faces weren't covered and they wore hoodies. Gomez testified that she "ended up on the ground in the street" next to Mitchell, and that the assailants on that side of the van took Mitchell's money from him. Mitchell described a "zombies" wallet that was taken from him, and he identified State's Exhibits 88-90 as photos of the wallet and his identification. Detective House testified that he and other officers located Curtis McShann and Jamarko Walker in the bathroom of LaJoyce Morris's apartment, and that he retrieved a "zombie" wallet from Walker's right front pants pocket. House also identified State's Exhibits 88-90 as photos of the wallet and Mitchell's identification.

{¶ 108} We conclude that Walker mischaracterizes the record regarding the testimony of the women who were with Mitchell near the van. Depp, who was on the passenger side of the van, testified that her assailant wore a black mask and that she could not see the faces of the assailants on the other side of the vehicle. We note that this testimony was consistent with that of Detective Roberts, who testified that in the course of his interview with Depp, she stated that she was approached by a man wearing a mask. Gomez testified that when she was on the driver's side of the van, she could not see the assailants' faces due to darkness, and she could not tell if the men were wearing masks. Auster, who was also on the passenger side of the van, testified that she did not get a good look at the person who approached her there, but she acknowledged telling detectives, "I think the dude was wearing a mask because I didn't see his face."

{¶ 109} We further note that Mitchell testified that he observed a third person, other than Walker and Curtis McShann, who entered Hughes's home, came back out, and started shooting. Hughes and Cunningham testified that the person who entered the

residence wore a mask, and Hughes testified that the dead body in the street was that of the person who entered his home. Det. Daugherty testified that, when he observed Lanier's body, there was a black tee shirt that "was tied * * * like it had been worn like a mask."  Based upon the foregoing, the jury could have reasonably concluded that Walker and Curtis McShann robbed Mitchell on the driver's side while Lanier approached the female witnesses on the passenger side of the van and then proceeded to the residence. The jury credited the testimony of the above witnesses, and we cannot conclude that Walker's conviction on Count 6, as an aider and abettor or principal offender, was against the manifest weight of the evidence or not supported by sufficient evidence.

{¶ 110} Regarding Count 7, Depp testified that her armed assailant (Lanier) approached her on the passenger side of the van and took her cell phone from her pocket. Regarding Count 9, Auster testified that her assailant (Lanier) approached her with a handgun and demanded that she put her hands on the van. She testified that she was patted down but did not have anything for her assailant to take.  The jury could have reasonably concluded that Walker aided and abetted Depp's aggravated robbery and Auster's attempted aggravated robbery, which were consistent with the aggravated robbery of Mitchell.  The jury credited Depp's and Auster's testimony, and we cannot conclude that Walker's convictions on Counts 7 and 9, were against the manifest weight of the evidence or unsupported by sufficient evidence, since Walker had a role in commission of the offenses.

Felonious Assault

{¶ 111} R.C. 2903.11 proscribes felonious assault and provides: "(A) No person

shall knowingly[4] do either of the following: (1) Cause serious physical harm[5] to another * * *; (2) Cause or attempt to cause physical harm[6] to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 112} Walker was convicted of eight counts of felonious assault, the first four of which were in violation of R.C. 2903.11(A)(2) (deadly weapon). Walker appears to suggest that his felonious assault convictions were against the manifest weight of the evidence and unsupported by sufficient evidence because of alleged discrepancies in the victims' testimony and the lack of DNA or fingerprint testing on the handgun. However, as noted above, Walker placed himself at the scene of the shooting in his interview with Det. Daugherty, he admitted owning the .9 millimeter handgun found at the apartment where he was arrested, and he admitted giving that weapon to Lanier. Mitchell also clearly identified him as a participant in the offenses with Curtis McShann. Further, Mitchell testified that Walker and Curtis McShann wore hoodies, and a hoodie was found

---

[4] "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B).

[5] Serious physical harm to persons means any of the following: * * * "(b) Any physical harm that carries a substantial risk of death; (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5).

[6] Physical harm to persons "means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

on the couch where Walker indicated that he slept. Finally, Daugherty testified that detectives knew that Walker did not use a handgun in the crime, but instead used a rifle, so DNA analysis on the handgun "wouldn't have benefitted the case." He further testified that it is difficult to obtain fingerprints from a handgun.

**{¶ 113}** The bill of particulars provided that the felonious assault in Count 11 related to the fatal gunshot wound to Lanier, Count 12 related to the gunshot wound sustained by Depp, Count 13 related to the gunshot wound sustained by Auster, and Count 14 related to the gunshot wound sustained by Cunningham. Dr. Uptegrove, who performed the autopsy on Lanier, testified that Lanier's death was caused by "a perforating gunshot wound to the chest." Depp testified that she still had bullet fragments in her body from being shot at the scene, and that she had limited mobility in her shoulder and her back. Auster testified that she was shot in the neck, hospitalized for two weeks, and "had to get surgery and get staples in my stomach. I still got the bullet in me." Cunningham testified that he was shot, that the bullet "came halfway out,' and that emergency personnel pulled it "the rest of the way out." The jury clearly credited the above witnesses' testimony, and we defer to its assessment of credibility. We conclude that, since Lanier, Depp, Auster and Cunningham sustained physical harm by means of a deadly weapon, Walker's convictions on Counts 11-14, felonious assault with a deadly weapon, whether as an aider and abettor or a principal offender, were not against the manifest weight of the evidence and that his convictions on those counts were supported by sufficient evidence.

**{¶ 114}** Walker's remaining felonious assault convictions were in violation of R.C. 2903.11(A)(1) (alleging serious physical harm). According to the bill of particulars, Count

15 related to the serious physical harm suffered by Lanier; Count 16 related to the serious physical harm suffered by Depp; Count 17 related to the serious physical harm suffered by Auster; and Count 18 related to the serious physical harm suffered by Cunningham. The testimony of these witnesses established that they suffered serious physical harm, and based upon this testimony, which the jury credited, we conclude that Walker's convictions on Counts 15-18, whether as an aider and abettor or a principal offender, were not against the manifest weight of the evidence and were supported by sufficient evidence.

### Aggravated Burglary

{¶ 115} R.C. 2911.11 proscribes aggravated burglary and provides:

(A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

* * *

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 116} It is well settled that jurors need not agree or be instructed on the specific underlying criminal offense it was the offender's purpose to commit. *See State v. Lynn*, 129 Ohio St.3d 146, 2011-Ohio-2722, 950 N.E.2d 931, ¶ 16; *State v. Marriott*, 189 Ohio App.3d 98, 2010-Ohio-3115, 937 N.E.2d 614, ¶ 29 (2d. Dist.). With respect to Count 5,

the bill of particulars identified the following potential underlying offenses: "theft and/or disorderly conduct and/or robbery and/or aggravated robbery and/or aggravated menacing and/or felonious assault * * *."

{¶ 117} Walker was convicted on Count 5 of aggravated burglary. According to the testimony presented, Lanier, Walker's accomplice, entered Hughes's home, armed with a deadly weapon. Hughes was present, and Cunningham testified that he and Damien Franklin were present as well. Cunningham testified that when Lanier entered the home, he pointed his weapon at the occupants. Hughes testified that when Lanier entered the home, he pulled the trigger of the weapon, and that it clicked but did not fire. On cross-examination, Hughes testified that the shooter ordered everyone to "get down, hit the floor." There was ample evidence for the jury to conclude that Walker's accomplice, Lanier, entered the home with a purpose to commit, at a minimum, theft, felonious assault, and/or aggravated robbery, and that Walker had a role in causing the commission of the crime. We conclude that Walker's conviction on Count 5 was not against the manifest weight of the evidence and that it was supported by sufficient evidence.

Improper Discharge of a Firearm at or into a Habitation

{¶ 118} R.C. 2923.161 provides: "(A) No person, without privilege to do so, shall knowingly do any of the following: (1) Discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."

{¶ 119} In Count 19, Walker was convicted of violating R.C. 2923.161. Speelman, Cunningham, Hughes, Updyke, and Cline testified regarding the bullet strikes on Hughes's residence as a result of the shooting. We cannot conclude that Walker's conviction on Count 19, whether as an aider or abettor or as a principal offender, was

against the manifest weight of the evidence, and we conclude that it was supported by sufficient evidence.

### Discharge of a Firearm on or near Prohibited Premises

{¶ 120} R.C. 2923.162 provides: (A) No person shall do any of the following: * * * (3) Discharge a firearm upon or over a public road or highway.

{¶ 121} Walker was convicted on Count 20 of violating R.C. 2923.162. Mitchell testified that Walker and McShann fired their weapons from the area near the passenger side of the van on Ryburn Avenue. Again, the jury credited Mitchell's testimony. We cannot conclude that Walker's conviction on Count 20 was against the manifest weight of the evidence, and it was supported by sufficient evidence.

### Having Weapons while under Disability

{¶ 122} R.C. 2923.13 proscribes having weapons while under disability. It provides:

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

* * *

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

{¶ 123} Walker was found guilty by the court of having weapons while under disability in Count 21. The parties stipulated that Walker was on intervention in lieu of conviction supervision on a pending indictment for possession of cocaine in Montgomery C.P. No. 2014-CR-3733 at the time of the offences charged in this case, and Walker carried and used a dangerous ordnance in the commission of his offenses. His conviction for having weapons while under disability was accordingly not against the manifest weight of the evidence and was supported by sufficient evidence.

Murder

{¶ 124} Finally, R.C. 2903.02 provides: "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." In Counts 1-4, Walker was convicted of the murder of Lanier as a proximate result of aggravated burglary, aggravated robbery, felonious assault, and improper discharge of a firearm at or into a habitation.

{¶ 125} As this Court stated in *State v. Dixon*, 2d Dist. Montgomery No. 18582, 2002-Ohio-541, *5 (and as the jury was instructed):

> * * * Under the "proximate cause theory," it is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the "proximate result" of Defendant's conduct in committing the

underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience. * * *

{¶ 126} Based upon the above analyses of Walker's guilt, we conclude that his murder convictions were not against the manifest weight of the evidence and were supported by sufficient evidence. In other words, the evidence herein easily supported a conclusion that Lanier's death was a direct, natural, and foreseeable consequence of Walker's commission, as a principal or an aider or abettor, of aggravated burglary, aggravated robbery, felonious assault, and improper discharge of a firearm at or into a habitation.

{¶ 127} Having reviewed the entire record, deferring to the jury's assessment of credibility, and having concluded that Walker's convictions were not against the manifest weight of the evidence, and that they were supported by sufficient evidence, Walker's first and second assignments of error are overruled.

{¶ 128} Having overruled all of Walker's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Charles W. Slicer, III
Hon. Richard Skelton